UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PEDRO RAMOS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 09 C 1058 |
| v. ) | |
| ) | Judge John W. Darrah |
| CITY OF CHICAGO, and CHICAGO POLICE ) | |
| OFFICERS JOHN STANLEY, JIM JOHNSON, ) | |
| TIMOTHY SHANAHAN, CESAR CLAUDIO ) | |
| and DETECTIVE MICHAEL PAGAN, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Pedro Ramos, brought suit against the City of Chicago, Chicago Police Officers John Stanley, Jim Johnson, Cesar Claudio, Timothy Shanahan and Detective Michael Pagan. Ramos's Amended Complaint states claims for (1) false arrest in violation of his Fourth Amendment rights; (2) malicious prosecution in violation of Illinois law; (3) violation of his Fourteenth Amendment rights; and (4) indemnification against the City of Chicago. Before the Court is Defendants' motion for summary judgment.

## BACKGROUND

On September 27, 2007, Jose Garcia, a Chicago Police detective, was in his back yard when he saw two men standing just inside the back door of his house. Defs.' 56.1(a)(3) ¶¶ 5, 8, 10. The two intruders noticed Garcia and fled into Garcia's house. *Id.* ¶ 11. As Garcia pursued, one of the intruders, later identified as Miguel Manzano, ran from the house, got into a station

wagon and drove south. *Id.* ¶¶ 10, 12, 13. Garcia got into his own vehicle and followed Manzano south while calling 911 for backup. *Id.* ¶¶ 13, 14. Detective Pagan responded to the dispatch call and assisted Garcia in arresting Manzano. *Id.* ¶¶ 15, 16.

After Manzana was arrested, Pagan radioed to other officers that the second intruder might still be in Garcia's house. *Id.* ¶ 19. Officers Stanley, Johnson, Claudio and Shanahan converged on Garcia's house. *Id.* ¶ 20. Pagan later transmitted further information about the second intruder, including that he was named "Jose." Pl.'s 56.1(b)(3) ¶ 4. Meanwhile, Officer Reidy obtained information regarding the description and location of the second intruder. Defs.' 56.1(a)(3) ¶ 21. Reidy transmitted that description over the radio, stating, "Supposedly the other guy with this guy he lives at 7249 South Lawndale, first name Jose, there's also a little tree out front he supposedly was in the house [sic]" and "Let them know he's a male Hispanic in his 20s supposedly wearing a red shirt but he took it off probably has a white 'dago tee' on he's about 5'2" bald. *Id.* ¶ 21. Finally, one of the officers radioed that the second offender was a "Saint," meaning that he belonged to the "Saints" street gang. Pl.'s 56.1(b)(3) ¶ 7; Defs.' Resp. to Pl.'s 56.1(b)(3) ¶ 7.

Based on Reidy's radio transmission, Officers Stanley, Johnson, Claudio and Shanahan departed Garcia's house for 7249 South Lawndale. Defs.' 56.1(a)(3) ¶ 22. As Claudio approached the front door of 7249 South Lawndale and spoke with individuals there, Stanley noticed Ramos pulling away from the curb. *Id.* ¶ 25. Ramos, a Hispanic male, was wearing a red shirt and appeared as if he could be in his 20s. *Id.* ¶ 25. Stanley motioned for the vehicle to stop and asked Ramos for his driver's license. *Id.* ¶ 26. Ramos did not have a driver's license but

2

produced his state identification to Stanley. *Id.* ¶ 27. Stanley asked Ramos to get out of the car, and Ramos complied. *Id.* ¶ 28. Stanley then handcuffed Ramos and placed him in the back of a police car, explaining that they were investigating a burglary. *Id.* ¶¶ 29, 30.

Approximately forty minutes after the burglary, Pagan drove Garcia to 7249 South Lawndale. *Id.* ¶ 31. Garcia immediately identified Ramos as the second intruder. *Id.* ¶ 32. Based on Garcia's positive identification, Stanley arrested Ramos for the burglary. *Id.* ¶ 35.

Ramos was charged with residential burglary in violation of 720 ILCS 5/19-3. *Id.* ¶ 38. At the time of his arrest, Ramos was 33 years old, was 6'1" and weighed 320 pounds. Pl.'s 56.1(b)(3) ¶ 10. On May 29, 2008, a bench trial was held, and Ramos was found not guilty of residential burglary. Defs.' 56.1(a)(3) ¶ 41.

## LEGAL STANDARD

Summary judgment is appropriate when there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (*Celotex*). Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court why there is no genuine issue of material fact, the nonmoving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that there remains a genuine issue of material fact and show that a rational jury could return a verdict in the nonmoving

party's favor.  *Celotex*, 477 U.S. at 322-27; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986) (*Anderson*); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (*Matsushita*); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992).  When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party.  *Anderson*, 477 U.S. at 247-48; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999).  However, a metaphysical doubt will not suffice. *Matsushita*, 475 U.S. at 586.  If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted.  *Anderson*, 477 U.S. at 249-50.

## ANALYSIS

Defendants have moved for summary judgment with respect to all of Ramos's claims.  In his opposition brief, Ramos explicitly abandons many of his claims.  Ramos states that his false-arrest claim is now directed only at Officer Stanley.  Ramos asserts his § 1983 "wrongful prosecution" claim only against Officer Shanahan and Detective Pagan.  Ramos states that his claims against Officers Claudio and Johnson should be dismissed.

### *False Arrest*

Central to the dispute over Ramos's false-arrest claim is the time when Ramos was placed under arrest.  Ramos does not dispute that Defendants had probable cause to arrest him after Garcia identified Ramos as the second intruder.  However, Ramos argues that he was under arrest before Garcia arrived, when Stanley handcuffed him and placed him into the back of the

4

police car. Defendants reply that before Garcia arrived to identify Ramos, Ramos was not under arrest; rather, Defendants were conducting a brief, investigatory stop, permitted under *Terry v. Ohio*, 392 U.S. 1 (1968) (*Terry*).

Police may arrest an individual when they have probable cause to believe the individual has committed a crime. *United States v. Mosby*, 541 F.3d 764, 768 (7th Cir. 2008). "A police officer has probable cause to arrest a person if, at the time of the arrest, the 'facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). Police may also make a brief, investigatory stop, known as a Terry stop, when they have a reasonable suspicion that criminal activity is ongoing. *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000). Reasonable suspicion, which is a lower level of suspicion than probable cause, "is 'some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.'" *Id*. (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

Distinguishing between a Terry stop and an arrest is "highly fact intensive." *United States v. Stewart*, 388 F.3d 1079, 1084 (7th Cir. 2004) (*Stewart*). The central question is "whether the nature of the restraint imposed meets the Fourth Amendment's standard of objective reasonableness." *Id*. (quoting *United States v. Vega*, 72 F.3d 507, 515 (7th Cir.1995) (*Vega*)). Where officers have reasonable grounds for believing that a suspect may be dangerous, handcuffs and similar restraints may be used without converting an investigatory stop into an arrest. *See Stewart*, 388 F.3d at 1085 (temporary detention in handcuffs and squad car of

5

individual matching description of bank robber not an arrest where police had reason to believe that the robber was armed and dangerous); *Vega*, 72 F.2d at 515-16 (hour-long detention of suspect believed to be dangerous at the "outer boundaries of a permissible Terry stop").

Here, Officer Stanley was justified in his initial stop of Ramos. Ramos matched some of the factors in the description of the second intruder, i.e., a Hispanic male, wearing a red shirt, young enough to appear to be in his 20s. Furthermore, Ramos was found at the address where Stanley had been told the second intruder lived. Stanley's continued detention of Ramos was also reasonable, even after Ramos produced his identification. At that point, Stanley knew that Ramos's first name was Pedro, not "Jose," and that Ramos was 6'1", not 5'2". However, that Ramos's sex, age, race, clothing, and location where he was found matched those characteristics of the second intruder justified the continued brief detention until Garcia arrived.

Finally, Stanley was justified in handcuffing Ramos and placing him in the back of a police car. Stanley had reason to believe that Ramos had recently been involved in a felony burglary and could have been carrying a weapon. Furthermore, Stanley had been told that the second intruder was a member of the Saints street gang. This and Ramos's considerable size (6'1" and 320 pounds) made Stanley's detention of Ramos while handcuffed reasonable given the totality of the circumstances confronting that officer.

Thus, Stanley's detention of Ramos prior to Garcia's arrival and identification of Ramos was not an arrest but, rather, a justifiable Terry stop. Stanley is therefore entitled to summary judgment on Ramos's false-arrest claim.

*§ 1983 Wrongful Prosecution*

In his opposition brief, Plaintiff describes his § 1983 wrongful-prosecution claim as follows: "Plaintiff was held in custody, and prosecuted for burglary, because Defendants Shanahan and Pagan misled prosecutors by making false statements that Manzano, the actual burglar, had implicated Plaintiff." Pl.'s Br. 7.

Defendants argue Ramos cannot bring a claim for malicious prosecution under § 1983 because "the existence of a tort claim under state law knocks out any constitutional theory of malicious prosecution." *Newsome v. McCabe*, 256 F.3d 747, 750 (7th Cir. 2001) (*Newsome*). Because Illinois recognizes the tort of malicious prosecution, Defendants argue, Ramos's § 1983 claim for malicious prosecution must fail.

Defendants' argument is persuasive. A deprivation of liberty by use of false evidence is a claim for malicious prosecution rather than a due process violation. *McCann v. Mangialardi*, 337 F.3d 782, 786 (7th Cir. 2003) (McCann). As noted above, a constitutional claim for malicious prosecution is not available where a state-law remedy exists. *Id*. (citing *Newsome*, 256 F.3d at 750). The Seventh Circuit has held that a plaintiff "cannot do an end run around the foregoing precedent by combining what are essentially claims for false arrest under the Fourth Amendment and state law malicious prosecution into a sort of hybrid substantive due process claim under the Fourteenth Amendment." *McCann*, 337 F.3d at 782. *See also Fox v. Hayes*, 600 F.3d 819, 841 (7th Cir. 2010) (false statements by police not an actionable due-process violation where state malicious-prosecution remedy existed); *Marshall v. Buckley*, 644 F. Supp. 2d 1075, 1079 (N.D. Ill. 2009).

Ramos suggests that he might establish a "*Brady*-type violation." *See Parish v. City of Chicago*, 594 F.3d 551 (7th Cir. 2009) (*Parish*). In order to show a *Brady* violation, a plaintiff must show: " (1) the evidence at issue is favorable to the accused, either being exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued." *Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008) (*Carvajal*). Defendants argue that even if Ramos could show the first two elements, he could not show the third because there was no prejudice to Ramos. Although the Seventh Circuit has expressed doubts that an acquitted defendant could ever establish prejudice, *see Carvajal*, 542 F.3d at 570, such a showing is possible. *See Parish*, 594 F.3d at 554 (asking whether "the decision to go to trial would have been altered by the suppressed evidence"). However, Ramos has not made any argument with respect to the prejudice prong of his *Brady* claim. Having failed to show prejudice, Ramos cannot prevail. Defendants are therefore entitled to summary judgment.

*Remaining State-Law Claims*

Ramos also brings state-law claims for malicious prosecution and indemnification. As all of Plaintiff's claims under federal law have been dismissed, pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over Plaintiff's state-law claims.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted with respect to Plaintiff's claims under §1983. The Court declines to exercise jurisdiction over Plaintiff's state-law claims.

Dated: 9/16/10

_____
JOHN W. DARRAH
United States District Court Judge